Unsealed 9/6/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
~~Sealed~~

Case No. _____

## 09-21834

IN RE: Request from the United Kingdom
Pursuant to the Treaty Between the
United States of America and the United
Kingdom on Mutual Assistance in Criminal
Matters in the Matter of Operation Yorkshire
_____/

MCKING MAGISTRATE
BANDSTRA

FILED by AJS D.C.

JUL - 1 2009

STEVEN M. LARIMORE
CLERK U. S. DIST CT
S. D. of FLA. – MIAMI

### UNDER SEAL

### MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER

The United States is seeking an order appointing a commissioner to collect evidence requested by the United Kingdom in its attached treaty request made pursuant to the Treaty between the United States of America and the United Kingdom on Mutual Assistance in Criminal Matters, 1994 WL 855115 (Treaty), entered into force December 2, 1996 [hereinafter referred to as the "Treaty"].

A treaty constitutes the law of the land. U.S. Const. art. VI. The provisions of a treaty have equal footing with acts of Congress and are binding on the courts. Asakura v. City of Seattle, Washington, 265 U.S. 332, 341 (1924); United States v. The Peggy, 5 U.S. 103 (1801); In re Commissioner's Subpoenas, 325 F.3d 1287, 1291 (11th Cir. 2003). To the extent that the provisions of a treaty are inconsistent with a preexisting statutory provision, the treaty supersedes the statute. Zschernig, et al. v. Miller, Administrator, et al., 389 U.S. 429, 440-441 (1968); In re Commisioner's Subpoenas, 325 F.3d 1287, 1305-1306 (11th Cir. 2003); United States v. Erato, 2 F.3d 11, 15-16 (2d Cir. 1993).

A.    The Treaty

The United States and the United Kingdom entered into the Treaty for the purpose of improving the effectiveness of the law enforcement authorities of both states in the investigation and prosecution of crime.  Preamble to the Treaty.  The Treaty obliges each state to provide assistance to the other in investigations and prosecutions of offenses, and in proceedings related to criminal matters.  Articles 1 and 19(1); In re Commissioner's Subpoenas, 325 F.3d 1287, 1290 (11th Cir. 2003). Each state contemplated that it would provide the other with assistance generally comparable to that which is available to its own law enforcement authorities, which assistance includes taking testimony or statements of persons, providing documents and other evidence, and immobilizing criminally obtained assets.  Article 1(2); Barr v. U. S. Department of Justice, 645 F. Supp. 235, 237 (E.D.N.Y. 1986), aff'd, 819 F.2d 25 (2d Cir. 1987).

The Treaty empowers federal district courts to execute treaty requests in order to comply with the United States' treaty obligation.  Article 5(1) provides that:

> The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

The Treaty contemplates that federal district courts will use compulsory measures to execute such requests.  Article 8(1) provides that:

> A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce documents, records, or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

The Treaty imposes no dual criminality requirement as a precondition for providing assistance.  Consequently, each state is obligated to provide assistance without regard to whether the

conduct under investigation or prosecution would constitute an offence under the laws of the Requested State. <u>See</u> Letter of Submittal of Treaty to the President from the Department of State, January 6, 1995.

B.     <u>Use of the Treaty to Execute Requests for Assistance</u>

The Treaty is self-executing and requires no implementing legislation. <u>See</u> Letter of Submittal of Treaty to the President from the Department of State, January 6, 1995; <u>In re Commissioner's Subpoenas</u>, 325 F.3d 1287, 1291 (11th Cir. 2003). Even so, it contains little in the way of a procedural framework for executing requests. Consequently, federal district courts routinely utilize the "commission" procedure authorized by 28 U.S.C. § 1782, the statute governing the provision of assistance for foreign judicial proceedings generally, as the "procedural vehicle" to fulfill their judicial responsibility under the Treaty of executing such requests. <u>In re Commissioner's Subpoenas</u>, 325 F.3d 1287, 1305-1306 (11th Cir. 2003).

1.     <u>Appointment of a commissioner</u>

Section 1782 provides in pertinent part:

> The district court . . . may direct that the testimony or statement [of a person who resides or is found within the district] be given or the document or other thing be produced, before a person appointed by the court.

A federal district court customarily appoints or "commissions" a person ("commissioner") to collect evidence on behalf of the court and authorizes the commissioner to submit the evidence collected to the requesting foreign court or authority. "Since the power of the commissioner comes from his appointment, any person who seems appropriate to the court may be appointed commissioner." <u>In re Letters of Request from the Supreme Court of Hong Kong</u>, 821 F. Supp. 204, 211 (S.D.N.Y.

1993). With requests for assistance in criminal matters, a court typically appoints an Assistant

United States Attorney as commissioner. However, a court also may commission a foreign authority

together with (or in lieu of) an Assistant United States Attorney. See, e.g., In re Letter of Request

from the Supreme Court of Hong Kong, 138 F.R.D. 27, 29 (S.D.N.Y. 1991).

Application to a federal district court for appointment of a commissioner to execute a foreign

request for judicial assistance is handled ex parte. In re Letter of Request from the Crown

Prosecution Service of the United Kingdom, 870 F.2d 686, 688 (D.C. Cir. 1989); In re Letters

Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976).

2.      Establishment of an evidence-collecting procedure

Section 1782 further provides in pertinent part that:

> To the extent that the order does not prescribe otherwise, the
> testimony or statement shall be taken, and the document or other
> thing produced, in accordance with the Federal Rules of Civil
> Procedure.

A federal district court empowers a commissioner to collect the evidence using the procedure

prescribed by the court. A court has "complete discretion in prescribing the procedure to be

followed." Sen. Rep. No. 1580, 88th Cong., 2d Sess. 1 (1964), reprinted in 1964 U.S. Code Cong.

& Admin. News 3782, 3789. When a court's order fails to specify a procedure by which a

commissioner is to collect the evidence, the Federal Rules of Civil Procedure apply. In re Letters

Rogatory from the Tokyo District Prosecutor's Office, Tokyo, Japan, 16 F.3d 1016, 1019 (9th Cir.

1994); In re Letter of Request from the Supreme Court of Hong Kong, 138 F.R.D. 27, 31 (S.D.N.Y.

1991). However, as Section 1782 makes clear, when a court does specify a procedure other than one

in accordance with the Federal Rules of Civil Procedure, the alternative procedure shall apply. 28

U.S.C. § 1782(a); Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1098 (2d Cir. 1995). In executing a request made pursuant to a treaty, a court has the obligation to prescribe effective and expeditious procedures designed to promote the purpose of the treaty. See In re Commissioner's Subpoenas, 325 F.3d 1287, 1305 (11th Cir. 2003).

        a.     Commissioner's subpoena

Article 5(1) provides for the issuance of procedural documents, such as subpoenas, to effectuate the gathering of evidence:

> The courts of the Requested Party shall have the authority to issue subpoenas, search warrants, or other orders necessary to execute the request.

If a federal district court so orders, a commissioner may use the attached form, entitled "commissioner's subpoena," to obtain the requested evidence. See In re Commissioner's Subpoenas, 325 F.3d 1287, 1291 (11th Cir. 2003)(incorporating in pertinent part the district court's order directing the use of commissioner's subpoenas); United States v. Erato, 2 F.3d 11, 13-14 (2d Cir. 1993)(incorporating in pertinent part the district court's order directing the use of commissioner's subpoenas). The commissioner's subpoena is a creation of neither the Federal Rules of Criminal Procedure nor the Federal Rules of Civil Procedure, but is an order of the court for the production of evidence in accordance with both the Treaty and Section 1782. See Article 5(1); 28 U.S.C. 1651; White v. National Football League, et. al, 41 F.3d 402, 409 (8th Cir. 1994), cert. denied, 515 U.S. 1137 (1995) (a court may issue whatever process it deems necessary to facilitate disposition of the matter before it). Upon authorization by a court, a commissioner may issue such commissioner's subpoenas as are necessary to execute the request.

A court, in keeping with its obligation to design effective and expeditious procedures to

promote the purpose of the Treaty, may authorize service of commissioner's subpoenas anywhere within the territory of the United States (i.e., coextensive with the service of subpoenas in U.S. criminal investigations and prosecutions pursuant to Rule 17, Federal Rules of Criminal Procedure). The Section 1782 limitation on the court's power to compel to "the district in which a person resides or is found" is inoperative in executing a treaty request.  In re Commissioner's Subpoenas, 325 F.3d 1287, 1305-1306 (11th Cir. 2003).

> b.    Notice of evidence taking

Article 8(1) requires the use of compulsory process in the execution of requests from the United Kingdom comparable or similar to the compulsory measures that would be used in domestic criminal investigations or prosecutions:

> A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce documents, records or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

Inasmuch as subpoenas are issued without notice to other than the recipients (i.e., no notice to targets, defendants, or third parties), commissioner subpoenas issued in execution of requests from the United Kingdom likewise should require no notice to other than the recipients.  Accordingly, a federal district court should authorize a commissioner to collect the evidence requested without notice to any party other than the recipient of the commissioner's subpoena except to the extent that a request from the United Kingdom asks for specific notice procedures.[1]

---

[1]  Historically, United States authorities have executed requests for judicial assistance in criminal matters without notification to actual or potential targets of investigations, or even to parties in proceedings, in order to protect against compromising foreign investigations and proceedings. Moreover, United States authorities customarily rely on the requesting courts and authorities to provide such notice directly to the relevant parties as foreign law requires.  Finally, requesting courts and authorities routinely request that United States

The United Kingdom has requested that this matter be kept confidential pursuant to the Treaty.  Article 7(1) provides that:

> The Requested State shall, upon request, keep confidential any information which might indicate that a request has been made or responded to.  If the request cannot be executed without breaching confidentiality, the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

In accordance with the Treaty, the United States requests that this Court's Order direct any individual or entity that receives a Commissioner's Subpoena in this matter to keep confidential the existence of the subpoena, its contents, and the response to the subpoena.

C.    The Present Request

The instant Treaty Request has been made by the Secretary of State for the Home Office, the Central Authority under Article 2 of the Treaty, in connection with a current criminal investigation by the Kent Police.

The Kent Police are prosecuting Darren Brian Quick (QUICK) for money laundering. QUICK was charged in the Maidstone (Kent) Crown Court on December 3, 2008, and a restraint order was issued against him.

In October 2008, United Kingdom police conducted a lawful search at the Kent residence of Jeanette and Derek Quick, QUICK's parents.  QUICK was present at the time.  Police located a box containing more than £126,000 in cash (approximately $220,000 in value).  All persons in the home

---

executing authorities follow particular, stated notice procedures when such procedures are necessary or useful under the foreign law or practice.  For example, foreign requests frequently ask (1) that a person to be interviewed (generally a defendant or suspect) be given notice of applicable testimonial privileges (e.g., against self-incrimination) at the time of the interview and (2) that a defendant and defense counsel be permitted to be present during the taking of testimony of a witness and be given sufficient notice to make arrangements.

arrested, with the parents ultimately being charged with conspiracy to facilitate money laundering.

In December 2008, United Kingdom police lawfully detained three men, including QUICK in a parking lot in Kent and conducted a drug search. The car used by QUICK was found to contain more than £193,000 in cash (approximately $293,000). Although no drugs were found, the cash and vehicle had high traces of cocaine and heroin. All three men were arrested, and QUICK was charged the next day with laundering the proceeds of drug trafficking.

In furtherance of their criminal proceedings, United Kingdom authorities are requesting account records from Bank United.

Accordingly, to execute this request, the government moves this Court to issue the attached proposed Order appointing the undersigned Assistant United States Attorney as Commissioner, authorizing the undersigned to take the actions necessary, including the issuance of Commissioner's subpoenas, to obtain the evidence requested, and to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in the United Kingdom.

WHEREFORE, the government requests that the Court enter the proposed order.

Respectfully submitted,

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

By: _____

MICHAEL E. SOFIA
ASSISTANT UNITED STATES ATTORNEY
Court Id No. A5501184
99 NE 4th Street
Miami, Florida 33132
Telephone No. (305) 961-9208
Facsimile No. (305) 536-7213
E-Mail Address: Michael.Sofia@usdoj.gov

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

# 09-21834

IN RE: Request from the United Kingdom
Pursuant to the Treaty Between the
United States of America and the United
Kingdom on Mutual Assistance in Criminal
Matters in the Matter of Operation Yorkshire

MCKING

MAGISTRATE
BANDSTRA

_____/

**UNDER SEAL**

**ORDER APPOINTING A COMMISSIONER**

Upon application of the United States, and upon review of the request from the United

Kingdom seeking evidence under the Treaty between the United States of America and the United

Kingdom on Mutual Assistance in Criminal Matters, 1994 WL 855115 (Treaty), entered into force

December 2, 1996, and the Court having fully considered this matter,

IT IS HEREBY ORDERED, pursuant to the authority conferred by the Treaty, as well as 28

U.S.C. § 1782 and this Court's inherent authority, that Michael E. Sofia is appointed as a

Commissioner of this Court and is hereby directed to execute the Treaty request as follows:

1.      take such steps as are necessary, including issuance of commissioner's subpoenas,

to collect the evidence requested;

2.      provide notice with respect to the collection of evidence to those persons identified

in the request as parties to whom notice should be given (and no notice to any other party shall be

required);

3.      copies of this sealed Order may be retained by the Commissioner and the relevant

investigating agency and a copy of this sealed Order may be served upon financial institutions as

needed to comply with the request for assistance from the United Kingdom;

    4.    adopt procedures to collect the evidence requested, consistent with its use in the investigation or proceeding for which the United Kingdom has requested assistance, which procedures may be specified in the request or provided by or with the approval of the United Kingdom Central Authority under the Treaty;

    5.    seek such further orders of this Court as may be necessary to execute this request; and

    6.    certify and submit the evidence collected to the Office of International Affairs, Criminal Division, United States Department of Justice, or as otherwise directed by that office for transmission to the United Kingdom.

IT IS FURTHER ORDERED that any individual and/or entity who receives a commissioner subpoena pursuant to this matter shall keep confidential the existence of the subpoena, the contents thereof, and the response to the subpoena.

IT IS FURTHER ORDERED that, in collecting the evidence requested, the Commissioner may be accompanied by persons whose presence or participation is authorized by the Commissioner, including, without limitation, federal law enforcement agents and/or representatives of the United Kingdom.

DONE and ORDERED at Miami, Florida, this _____ day of _____, 2009.


_____
UNITED STATES DISTRICT JUDGE


cc:    Michael E. Sofia, AUSA

2

COMMISSIONER'S SUBPOENA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TO:    _____

                 _____

                 _____

I, Michael E. Sofia, Assistant United States Attorney for the Southern District of Florida, acting under the authority of the Treaty Between the United States of America and United Kingdom on Mutual Legal Assistance in Criminal Matters, and under Title 28, United States Code, Section 1782, for the purpose of rendering assistance to the United Kingdom, command that you appear before me in Room 700, in the James Lawrence King Federal Building located at 99 N.E. 4th Street, Miami, Florida, on _____, 2009, at _____ a.m./p.m., to provide testimony/documents regarding alleged violations of the laws of the United Kingdom, namely, drug trafficking and money laundering, and that at the time and place aforesaid you provide the following:

For failure to attend and provide testimony/said documents, you may be deemed guilty of contempt and liable to penalties under the law.

Dated:

COMMISSIONER MICHAEL E. SOFIA
Assistant United States Attorney for the
Southern District of Florida
Telephone No. (305) 961-9208





**Home Office**

UK CENTRAL AUTHORITY
Judicial Co-operation Unit

5th Floor, Fry Building, 2 Marsham Street, LONDON SW1P 4DF
Telephone 020 7035 1257 Fax 0207-035-6985
E-mail Althea.Bowes@homeoffice.gsi.gov.uk
http://police.homeoffice.gov.uk/operational-policing/mutual-legal-assistance/

The US Department of Justice
Office of International Affairs
Criminal Division
Bond Building Room 5100
1400 New York Avenue N.W
Washington DC 20530

| | |
|---|---|
| Our Ref | MLO2009USA511543 |
| Date | 13th May 2009 |

Dear Sir/Madam,

REQUEST FOR MUTUAL LEGAL ASSISTANCE FROM THE UNITED STATES OF AMERICA RE: OPERATION YORKSHIRE

We are forwarding to you a request for assistance from the Director of the Crown Prosecution Service (CPS). CPS has requested assistance in giving effect to a restraint order and confiscation order made by Maidstone Crown Court.

This request is made under Mutual Legal Assistance Treaty (MLAT) between the United Kingdom of Great Britain and Northern Ireland and United States of America 1994.

Any evidence obtained should be returned to me (or handed to the visiting British Officers). I would add that under Section 9(2) of the Crime (International Co-operation) Act 2003, the evidence obtained as a result of this letter of request cannot be used, without your consent, for any other purpose than that specified in the request.

I would be grateful if you could acknowledge receipt of this request either by email, fax or mail as you deem appropriate. I look forward to hearing from you soon.

Yours faithfully,

Ms A Bowes
*For and on behalf of the Secretary of State*

182-31044

Roger Coe-Salazar OBE
Chief Crown Prosecutor

KENT



**CPS**

The Competent Judicial Authority
of the United States of America,
Office of International Affairs
Washington DC

*Our Reference:* 46/CY/10108/08/ESS

*Your Reference:*

*Date:* 17th April 2009

Dear Sirs,

**Letter of Request: Operation YORKSHIRE**

The Crown Prosecution Service of England and Wales presents it compliments to the Competent Judicial Authorities of The United States of America and has the honour to request their assistance, pursuant to the Mutual legal Assistance Treaty 1994 (MLAT) in relation to a criminal prosecution resulting from the criminal investigation conducted by the officers of Kent Police.

The Prosecution of Offences Act (1985) states that the Director of Public Prosecutions has the duty to take over the conduct of criminal proceedings (other than certain proceedings relating to relatively minor offences) instituted on behalf of a Police Force. The Director also has power to give, to the extent he considers appropriate, advice to police forces on all matters relating to criminal offences.

The Director is the head of the Crown Prosecution Service.  As a Crown Prosecutor designated by him, I have his powers to conduct the proceedings in this case and I am designated a judicial authority under Article 24 of the Convention. Accordingly I am empowered to issue this letter.

Criminal proceedings for offences including offences of money laundering have been instituted against : -

**NAME:**          Darren Brian QUICK
**DATE OF BIRTH:** ▮▮▮▮1965
**ADDRESS:**       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ME1 3GP
**NATIONALITY:**   **British**



SECCU
Crown Prosecution Service
Priory Gate
29 Union Street
Maidstone
Kent
ME14 1PT

DX 4830 MAIDSTONE
T.  01622 626911
F.  01622 356395

The Crown Court exercising jurisdiction in this case is the Crown Court at Maidstone, Kent, United Kingdom. On 3rd December 2008, Darren Brian QUICK was charged with the following offences:

Money laundering offences are contrary to Sections 327, 328 and 329 of the Proceeds of Crime Act 2002.  All of these offences carry a maximum penalty of 14 years imprisonment on conviction.

### Money Laundering Offences

Section 327(1) states - A person commits an offence if he:-
  (a) conceals criminal property;
  (b) disguises criminal property;
  (c) converts criminal property;
  (d) transfers criminal property;
  (e) removes criminal property from England and Wales or from Scotland or Northern Ireland.

Section 328(1) states - A person commits an offence if he enters into or becomes concerned in an arrangement which he knows or suspects facilitates (by whatever means) the acquisition, retention, use or control of criminal property by or on behalf of another person.

Section 329(1) states – A person commits an offence if he;-
  (a) acquires criminal property;
  (b) uses criminal property;
  (c) has possession of criminal property.

Section 340(3) defines the term criminal property, it states;
Property is criminal property if:-
  (a) it constitutes a person's benefit from criminal conduct or it represents such a benefit (in whole or part and whether directly or indirectly), and
  (b) the alleged offender knows or suspects that it constitutes or represents such a benefit.

### Summary of Facts

On 21st October 2008, police attended ████████████████████, Kent, the home address of Jeanette and Derek QUICK. Also present at the address was their son, Darren Brian QUICK, (the defendant in this case). A cardboard box was located in a bedroom at the property containing a large amount of cash, £126,150.00. All persons present were arrested and subsequently bailed.

On 2nd December 2008, three men were observed in the car park of the Malta Inn Public House in Maidstone, Kent and were detained for the purpose of a drugs search. The three men were Darren Brian QUICK, Norrie John HYDE and Stephen JARRETT.  During a search of a vehicle which Darren QUICK was using, large quantities of cash were located in a card board box (£126,070.00) and also in a plastic bag (£66,960.00). No drugs were located. All three men were arrested and subsequently charged with money laundering offences.

The vehicles and the cash have been examined and found to contain high traces of cocaine and heroin.

Darren Brian QUICK's home address is ████████████Rochester. This is a five bedroom detached property with an estimated value of £400,000. The property is fitted with security cameras and large gates. Within the detached double garage at the property were two expensive vehicles worth approximately £140,000.00. Approximately £2000 was recovered from a safe, which was located in a cupboard near to the front door. A money-counting machine was seized from the master bedroom. A number of computers, mobile phones and bank documentation were also recovered during the search. Documentation relating to frequent foreign holidays in Florida, USA was found at the address. There was no indication that any business was being conducted from the premises.

Financial enquiries have revealed Darren Brian QUICK is the director of a company called Medway Building Solutions. However, his declared income for the past three years was below £10,000 and there is no evidence from his identified accounts of transactions consistent with a building firm. Nor is there evidence of income likely to lead to his possession of the two large sums of money he was found in possession of on 21st October 2008 and 2nd December 2008.

It has also been established he owns a property in America. The address is ████████ ████Clermont, Florida, 34711. He has made frequent visits to America and made large spending on credit cards. The property is a large 5 bedroomed property with an estimated value of $200,000.00 which is managed by Advantage Vacation Homes, 7799 Styles Boulevard, Kissimee, Florida, 34747. The property was purchased on 12.12.2003 for $223,000 and there was a mortgage on the property for $167,200 with Bank United FSB based in Miami, Florida. This mortgage was settled in full on 17.09.2005.

Investigations have been made into the finances of Darren Brian QUICK's parents, Jeanette and Derek QUICK. Both are retired and receive a state pension and an employment pension. A joint account has been identified with Alliance & Leicester. Despite both being retired and only having an income consisting of pensions totalling about £1400 per month, this account has had in the region of £755,000 deposited into it since 2003. Almost the same amount has been withdrawn in either the form of cheques or large international bank transfers. Darren Brian QUICK's parents were both interviewed about the transactions in their bank account but made No Comment to all relevant questions. They have since been charged with conspiracy to launder the proceeds of crime.

The police have made enquires regarding the international transfers and have ascertained that the transfers were sent to an account held with WACHOVIA BANK, Florida, account number ████████9562 in the name Mr. D. QUICK.

It is the prosecution case that Darren Brian QUICK has generated finances far beyond his declared legitimate means and has done so through the proceeds of criminality, namely drug supply. It is also believed that Darren Brian QUICK has laundered the funds from his criminality through his businesses held in the United Kingdom, namely Medway Building Solutions and Medway Building Projects. Darren QUICK is shown as the director of both Companies. He had a third company, Quick Negotiations Limited, which was active between September 2005 and April 2007. He has also laundered funds through his parents' bank account and through other accounts held in the United States of America.

Darren Brian QUICK has been made subject of a restraint order prohibiting the disposal of assets under section 41 of the Proceeds of Crime Act 2002. This order prohibits the disposal of assets held by Darren Brian QUICK whether they are held in or outside England and Wales.   As detailed above, the police are in possession of information to the effect that a substantial amount of money has been transferred to The United States of America.

**Enquiries To Be Made**

For officers from Kent Police (as identified) to travel and work with Officers from the appropriate judicial or police authority in order to obtain the following information:-

After obtaining any necessary court order or other authority to:

- Identify all bank accounts held by Darren Brian QUICK, date of birth ████1965.
- Identify all bank accounts held by his wife Friday Jane QUICK and his parents Jeanette and Derek QUICK.
- Make enquiries with WACHOVIA BANK, 3201 West Vine Street, Kissemee Florida in respect of account number ████9562 held by Darren Brian QUICK together with any other accounts that he may hold.
- Obtain details of deposits and movement of funds to and from all his account/s since December 2002 together with account opening documents and information.
- Obtain copies of statements of account together with documents relating to the movement of funds into and from the account.
- Obtain transfer documents showing the purchase of ████████, Clermont, Florida, 34711 by Darren Brian QUICK and any document registering ownership together with the origins of payments made for the property.
- Obtain details of all records held regarding a mortgage with Bank United FSB taken out by Darren QUICK in December 2003 including copies of the mortgage application and details of all payments made including the origin of payments made to settle the mortgage.
- Prohibit the disposal of assets held by Darren Brian QUICK in The United States of America.
- It is also requested that other enquiries are made, persons interviewed and documents secured as appears to be necessary in the course of the investigation to trace any property held by or on behalf of persons aforementioned.

The information obtained is required for both the ongoing criminal investigation court proceedings as well as for the subsequent confiscation proceedings.


**Form In Which It Is Requested The Evidence Is Presented:**

It is requested that each witness statement be taken in writing, dated and headed with the following declaration:

"This statement consisting of ...... pages is true to the best of my knowledge and belief".

When the statement has been written the number of pages should be filled in the space and the witness should sign the statement beside the declaration and thereafter on every page and at the end.  It is requested that the witnesses' address telephone number and date of birth be written on the back of the first page of the statement.

Where documentation or any other item is obtained from a witness, the witness should produce each document or item as an exhibit in his/her statement.  In order to do this the statement should describe the document or item and give it an exhibit number. This should consist of the witnesses' initials and a consecutive number. For example the first document produced by John Andrew Smith will have the exhibit number JAS 1 and the second JAS 2 and so on.

The address for these Officers is: -

Kent Police Financial Investigation Unit,
Police Headquarters
Sutton Road
Maidstone
Kent
ME15 9BZ
United Kingdom

Telephone: 0044 1622 654346
Facsimile:   0044 1622 654349
Email : Joanna.gibbins@kent.pnn.police.uk

2. That any further enquiries are made, persons interviewed, exhibits and Court Orders obtained as appears necessary in the course of the investigation.

3. That the witnesses be asked if they are prepared to travel to England to give evidence in person.

4. That any information held on computer in any form be preserved and secured from unauthorised interference and made available in due course for use in any criminal or confiscation proceedings relating to this enquiry.

5. That statements made and documents or other items secured in relation to the matters set out in this request be made available to the officers referred to above and permission be given for their removal to the United Kingdom, for use in any criminal trial, civil proceedings, confiscation or other ancillary proceedings that can be shown to relate to this enquiry.

6. I confirm that the enquiries requested could be made by Police under powers currently available to them if the enquiries were made in England rather than the United States of America.

7. The competent Judicial Authorities of The United States of America are asked to use their best efforts to maintain the confidentiality of this request and its contents.

The Crown Prosecution Service would like to take this opportunity to thank the Judicial Authorities of The United States of America in advance for their co-operation and avails itself of the opportunity to renew to them its assurances of its highest consideration.

Contact details:
Eunice Shang-Simpson
Telephone: 0044 1622 356339
Facsimile: 0044 1622 356395
Email:       Eunice.shang-simpson@cps.gsi.gov.uk

Yours faithfully

Eunice Shang-Simpson
Crown Prosecutor

1

| 104TH CONGRESS<br>*1st Session* | SENATE | TREATY DOC.<br>104–2 |
|---|---|---|

## TREATY WITH THE UNITED KINGDOM ON MUTUAL LEGAL ASSISTANCE ON CRIMINAL MATTERS

———

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT WASHINGTON ON JANUARY 6, 1994, TOGETHER WITH A RELATED EXCHANGE OF NOTES SIGNED THE SAME DATE



JANUARY 23, 1995.—Treaty was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

———

U.S. GOVERNMENT PRINTING OFFICE

99–118                                    WASHINGTON : 1995

## LETTER OF TRANSMITTAL

———————

THE WHITE HOUSE, *January 23, 1995.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, signed at Washington on January 6, 1994, with a related exchange of notes signed the same date. Also transmitted for the information of the Senate is the report of the Department of State with respect to this Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of modern criminals, including members of drug cartels, "white-collar criminals," and terrorists. The Treaty is self-executing.

The Treaty provides for as broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and evidence; (3) the service of legal documents; (4) the location or identification of persons; (5) the execution of requests for searches and seizures; and (6) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime and the collection of fines imposed as a sentence in a criminal prosecution.

I recommend that the Senate give early and favorable consideration to the Treaty, and related exchange of notes, and give its advice and consent to ratification.

WILLIAM J. CLINTON.

(III)

## LETTER OF SUBMITTAL

———

DEPARTMENT OF STATE,
*Washington, January 6, 1995.*

THE PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the "Treaty"), signed at Washington on January 6, 1994, together with a related exchange of notes signed on the same date. I recommend that the Treaty and the related exchange of notes be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with Argentina, the Bahamas, Canada, Italy, Mexico, Morocco, the Netherlands, Spain, Switzerland, Thailand, Turkey, the United Kingdom concerning the Cayman Islands, and Uruguay. Other similar treaties have been signed and ratified by the United States (but have not yet entered into force) with Belgium, Colombia, and Jamaica. In addition, treaties with Nigeria and Panama have been transmitted to the Senate and await Senate consideration. This Treaty contains many provisions similar to those in the other treaties.

This Treaty will enhance our ability to investigate and prosecute drug-related money laundering offenses. It is designed to be self-executing and will not require implementing legislation.

Article 1 provides for mutual assistance in "proceedings", which is defined in Article 19 to include any measure taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure, and forfeiture of proceeds and instrumentalities of crime and the imposition of fines related to a criminal prosecution.

The Treaty does not contain a provision limiting assistance to offenses which are proscribed under the law of the Party from which assistance is requested (the "Requested Party"). As clarified in the interpretative notes that accompany the Treaty, however, the Treaty does not apply to anti-trust or competition investigation or proceedings underway at the time the Treaty was signed. This exchange of notes also provides that the Central Authorities of the Parties may, at a later date, provide assistance in such proceedings as may be agreed in writing between the Parties.

(V)

VI

Article 1 further provides that assistance under the Treaty shall include: taking the testimony or statements or persons; providing documents, records, and evidence; serving documents; locating or identifying persons; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and such other assistance as may be agreed between the Central authorities.

Article 1 explicitly states that the Treaty does not create rights in private parties to obtain, suppress, or exclude evidence, or to impede the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority is the Attorney General or a person designated by the Attorney General. For the United Kingdom, the Central Authority is the Secretary of State for the Home Department or the Secretary's designee. The article provides that requests under the Treaty shall be made directly between the Central Authorities.

Article 3 sets forth the circumstances under which a Party may deny assistance under the Treaty, including requests related to certain military offenses, offenses of a political character, and requests relating to an offender who, if proceeded against in the Requested Party, would be entitled to be discharged on grounds of a previous acquittal or conviction. In addition, a Requested Party may also refuse assistance, if, in its view, the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy. As clarified in the interpretative notes accompanying the Treaty, the limitation based on "important public policy" grounds would include a Requested Party's policy of opposing the exercise of jurisdiction which, in its view, is extraterritorial and objectionable.

Before denying assistance, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions it deems necessary. If the Requesting State accepts assistance subject to conditions, it shall comply with the conditions.

Article 4 prescribes the form and content of written requests under the Treaty, specifying in detail the information required in each case. The article specifies further information to be provided to the extent necessary and possible to assist in locating individuals and effecting particular types of assistance.

Article 5 provides that a Request Party shall take whatever steps it deems necessary to give effect to requests from the other Party. Courts in the Requested State are empowered to issue subpoenas, search warrants, or other order orders necessary to execute such requests.

Article 5 further states that requests be executed in accordance with the laws of the Requested State unless the Treaty provides otherwise. The method of execution specified in the request is to be followed to the extent that it is not incompatible with the laws and practices of the Requested Party. If the Central Authority of the

VII

Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in its territory, it may postpone execution or, after consultations with the Requesting Party, impose conditions on such execution. If the Requesting Party accepts assistance subject to such conditions, it shall comply with them.

Under Article 5, the Central Authority of the Requested Party shall promptly inform its counterpart in the Requesting Party of the outcome of the execution of a request. If a request is denied, a Central Authority shall inform its counterpart of the reasons for such denial.

Article 6 apportions between the two States the costs incurred in executing a request. Generally, each State shall bear the expenses incurred within its territory of executing a request.

Article 7 establishes procedures both for ensuring the confidentiality of requests and their contents. Upon request, the Requested Party shall keep confidential any information that might indicate that a request has been made or responded to. However, if a request cannot be executed without breaching confidentiality, the Requested State must inform the Requesting State, so that the Requesting State may determine whether to withdraw the request in order to maintain confidentiality. Article 7 further obliges the Requesting Party not to use or disclose any information or evidence obtained under the treaty for purposes unrelated to the proceedings stated in the request without the prior consent of the Requested Party. In the interpretative notes, the Parties recognize that these prohibitions will not prohibit a Requesting Party from disclosing such information to the extent there is an obligation to do so under that Party's Constitution or law. This last clarification was provided to ensure that the United States and the United Kingdom authorities would be in a position to make available exculpatory information to criminal defendants.

Article 8 provides that the Requested Party may compel, if necessary, the taking of testimony or production of documents in its territory on behalf of the Requesting Party. In the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting Party, the testimony or evidence shall be taken and the claim made known to the Requesting Party for resolution by its authorities.

Article 8 also requires the Requested Party, upon request, to inform the Requesting Party in advance of the date and place of the taking of testimony. The Requested Party must also permit the presence of any persons specified in the request (such as the accused, counsel for the accused, or other interested person) and to permit such persons to question the person whose testimony is being taken, through a legal representative qualified to appear before the courts of the Requested Party. Finally, this article provides a mechanism for authentication of documentary evidence produced pursuant to this article and provides that no further authentication or certification shall be necessary in order for such information to be admissible in evidence in proceedings in the Requesting Party.

Article 9 requires that the Requested Party provide the Requesting Party with copies of publicly available records of government departments and agencies. The Requested Party may further pro-

VIII

vide copies of other records or information in the possession of a government department or agency but not publicly available to the same extent and under the same conditions as it would to its own law enforcement or judicial authorities. The article requires official authentication of documents furnished, using forms appended to the Treaty and confirms their admissibility in evidence in the Requesting Party if so authenticated.

Article 10 provides a mechanism for a Requesting Party to invite the voluntary appearance and testimony in its territory of a person located in the Requested Party. In such a case, the Central Authority of the Requested Party is required to invite the person to appear and promptly inform the Central Authority of the Requesting Party of the person's response. The request may state that the Requesting Party will assure the person shall not be subject to service of process or be detained or subjected to restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party. This safe conduct shall cease fifteen days after the Central Authority of the Requesting Party has notified its counterpart that the person's presence is no longer required, or if the person has left the territory of the Requesting Party and voluntarily returns to it.

Article 11 provides for the voluntary transfer to one Party of a person in custody in the other Party, for purposes of assistance under the Treaty, provided that the person in question and both Parties agree. The article establishes the express authority and the obligation for the Requesting Party to maintain the person in custody unless otherwise authorized by the Requested Party. It further specifies the requirements for ensuring the person's safety and return to the Requested Party.

Article 12 provides that the Requested Party shall use its best efforts to ascertain the location or identity of persons specified in a request and shall promptly notify the Requesting Party of the results of its inquiries.

Under Article 13, a Requested Party shall, to the extent possible, effect service of process of any document requested under the Treaty, including subpoenas or other process requiring the appearance of any person before any authority or tribunal in the territory of the Requesting Party. Such service, however, does not impose an obligation under the law of the Requested Party to comply with such process. The article further requires that any request for the service of a document requiring a person to appear in the territory of the Requesting Party be transmitted a reasonable time before the scheduled appearance. The Requested Party is required to return proof of service.

Article 14 obligates each Party to execute requests for search, seizure, and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party. The Requested Party may refuse such a request if it relates to conduct for which its own powers of search and seizure would not be exercisable in a similar circumstance. The article further provides for the authentication and certification of evidence delivered under this article and provides that the Central

IX

Authority of the Requested Party may impose conditions on transfer to protect third party interests in the property.

Article 15 obliges the Requesting Party to return any documents or articles furnished to it under this treaty unless the Central Authority waives such return.

Article 16 obligates the Parties to assist each other in asset forfeiture proceedings. Specifically, the Parties agree to assist each other in proceedings involving the identification, tracing, freezing, seizure, or forfeiture of the proceeds and instrumentalities of crime and to assist each other in relation to proceedings involving the imposition of fines related to a criminal prosecution. Under this article, a Requested Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by the former's domestic law, upon such terms as may be agreed.

Article 17 provides that assistance and procedures provided in this Treaty shall not prevent the Parties from providing assistance to each other through the provisions of other international agreements, national laws, or any other arrangement, agreement, or practice applicable between their law enforcement agencies.

Article 18 provides that the Parties or their Central Authorities shall consult promptly at the request of either, concerning the implementation of this Treaty. Article 18 also contains novel consultative procedures to enable the Parties to have first recourse to the Treaty, with respect to any matter for which assistance could be granted under the Treaty, prior to the enforcement of a "compulsory measure" requiring an action to be performed by a person located in the territory of the other Party. The term "compulsory measure" is described with greater specificity in the interpretative notes. Under the consultative mechanisms for dealing with the enforcement of compulsory measures, if a Party is aware that its authorities are intending to take such compulsory measures, its Central Authority shall inform the other Central Authority, who may request consultations. Should a Central Authority learn that such measures may be taken in its territory, it may also request consultations. Ultimately, should consultations fail to resolve the matter, cause unreasonable delay, or jeopardize the successful completion of a proceeding, enforcement of the compulsory measure is not foreclosed. In such instance the Central Authority of the Party taking such action may give written notice to the other Central Authority of that circumstance. Article 18 finally provides for a general obligation of the parties to exercise moderation and restraint, even when the Parties' consultation obligations under this article are satisfied.

In addition to the consultative mechanism for compulsory measures described above, the interpretative notes commit the U.S. Department of Justice, on behalf of the United States Government, to take certain specified practical measures to reduce the number of instances in which a conflict of laws, policies, or national interests may arise. Specifically, the notes state that the Department of Justice shall: (1) Instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2) with respect to any matter for which assistance could be granted under the Treaty unless the U.S. Central Authority has concluded that the consultative mechanisms in Article 18 have been satisfied; (2) instruct all fed-

X

eral prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the U.S. Central Authority has concluded that the consultative mechanisms in Article 18 have been satisfied; and (3) undertake to discourage the issue of compulsory measures by other U.S. Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

Article 19 defines the term "proceedings", thus setting forth the matters for which the Parties will provide assistance under the Treaty. As noted above, the term "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offenses, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution. Article 19 further provides that the Central Authorities may at their discretion treat as proceedings such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the Parties.

Article 20 sets forth the territorial application of the Treaty. With respect to the United Kingdom, the Treaty shall apply to England, Wales, Scotland, Northern Ireland, the Isle of Man, Channel Islands, and to any other territory for whose international relations the United Kingdom is responsible and to which this Treaty shall have been extended by agreement between the Parties.

Article 21 provides that the treaty shall be ratified and shall enter into force upon an exchange of instruments of ratification.

Article 22 provides for termination to be effective six months after written notice of termination is given by one party to the other Party.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty and related exchange of notes by the Senate as soon as possible.

Respectfully submitted,

WARREN CHRISTOPHER.

TREATY BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNMENT OF THE UNITED KINGDOM

OF GREAT BRITAIN AND NORTHERN IRELAND

ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

2

# CONTENTS

Preamble

| | |
|---|---|
| Article 1 | Scope of Assistance |
| Article 2 | Central Authorities |
| Article 3 | Limitations on Assistance |
| Article 4 | Form and Contents of Requests |
| Article 5 | Execution of Requests |
| Article 6 | Costs |
| Article 7 | Confidentiality and Limitations on Use |
| Article 8 | Taking Testimony and Producing Evidence in the Territory of the Requested Party |
| Article 9 | Records of Government Agencies |
| Article 10 | Personal Appearance in the Territory of the Requesting Party |
| Article 11 | Transfer of Persons in Custody |
| Article 12 | Location or Identification of Persons |
| Article 13 | Service of Documents |
| Article 14 | Search and Seizure |
| Article 15 | Return of Documents and Articles |
| Article 16 | Assistance in Forfeiture Proceedings |
| Article 17 | Compatibility with Other Arrangements |
| Article 18 | Consultation |
| Article 19 | Definitions |
| Article 20 | Territorial Application |
| Article 21 | Ratification and Entry into Force |
| Article 22 | Termination |

3

TREATY BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM
OF GREAT BRITAIN AND NORTHERN IRELAND
ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

The Government of the United States of America and The
Government of the United Kingdom of Great Britain and Northern
Ireland,

Desiring to improve the effectiveness of the law enforcement
authorities of both countries in the investigation, prosecution,
and combatting of crime through cooperation and mutual legal
assistance in criminal matters,

Reaffirming their determination to enhance assistance in the
fight against crime as set out in the Agreement Concerning the
Investigation of Drug Trafficking Offences and the Seizure and
Forfeiture of Proceeds and Instrumentalities of Drug Trafficking,
done at London February 9, 1988,

Have agreed as follows:

4

- 2 -

## ARTICLE 1
### Scope of Assistance

1.  The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, for the purpose of proceedings as defined in Article 19 of this Treaty.

2.  Assistance shall include:

  (a)  taking the testimony or statements of persons;

  (b)  providing documents, records, and evidence;

  (c)  serving documents;

  (d)  locating or identifying persons;

  (e)  transferring persons in custody for testimony (or other purposes);

  (f)  executing requests for searches and seizures;

  (g)  identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime and assistance in related proceedings; and

  (h)  such other assistance as may be agreed between Central Authorities.

3.  This Treaty is intended solely for mutual legal assistance between the Parties.  The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

5

- 3 -

**ARTICLE 2**

**Central Authorities**

1.  Central Authorities shall be established by both Parties.

2.  For the United States of America, the Central Authority shall be the Attorney General or a person or agency designated by him.  For the United Kingdom, the Central Authority shall be the Secretary of State for the Home Department or a person or agency designated by him.

3.  Requests under this Treaty shall be made by the Central Authority of the Requesting Party to the Central Authority of the Requested Party.

4.  The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

**ARTICLE 3**

**Limitations on Assistance**

1.  The Central Authority of the Requested Party may refuse assistance if:

   (a)  the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy;

6

- 4 -

(b) the request relates to an offender who, if proceeded against in the Requested Party for the offence for which assistance is requested, would be entitled to be discharged on the grounds of a previous acquittal or conviction; or

(c) the request relates to an offence that is regarded by the Requested Party as:

(i) an offence of a political character; or

(ii) an offence under military law of the Requested Party which is not also an offence under the ordinary criminal law of the Requested Party.

2.  Before denying assistance pursuant to this Article, the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary.  If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.

**ARTICLE 4**

Form and Contents of Requests

1.  Requests shall be submitted in writing.  However, in urgent circumstances, the request may be made orally but shall be confirmed in writing within ten days thereafter.

7

- 5 -

2.  The request shall include the following:

    (a)    the name of the authority conducting the proceedings to which the request relates;

    (b)    the subject matter and nature of the proceedings for the purposes of which the request is made;

    (c)    a summary of the information giving rise to the request;

    (d)    a description of the evidence or information or other assistance sought; and

    (e)    the purpose for which the evidence or information or other assistance is sought.

3.  To the extent necessary and possible, a request shall also include:

    (a)    the identity, date of birth and location of any person from whom evidence is sought;

    (b)    the identity, date of birth and location of a person to be served, that person's relationship to the proceedings, and the manner in which the service is to be made;

    (c)    available information on the identity and whereabouts of a person to be located;

    (d)    a precise description of the place or person to be searched and of the articles to be seized;

    (e)    a description of the manner in which any testimony or statement is to be taken and recorded;

    (f)    a list of questions to be asked of a witness;

8

- 6 -

(g) a description of any particular procedures to be
followed in executing the request;

(h) information as to the allowances and expenses to
which a person asked to appear in the territory of
the Requesting Party will be entitled;

(i) any other information which may be brought to the
attention of the Requested Party to facilitate its
execution of the request; and

(j) requirements for confidentiality.

4.  The Requested Party may ask the Requesting Party to
provide any further information which appears to the Requested
Party to be necessary for the purpose of executing the request.


ARTICLE 5

Execution of Requests


1.  As empowered by this Treaty or by national law, or in
accordance with its national practice, the Requested Party shall
take whatever steps it deems necessary to give effect to requests
received from the Requesting Party.  The courts of the Requested
Party shall have authority to issue subpoenas, search warrants,
or other orders necessary to execute the request.

2.  When execution of the request requires judicial or
administrative action, the request shall be presented to the
appropriate authority by the persons appointed by the Central
Authority of the Requested Party.

9

- 7 -

3. The method of execution specified in the request shall be followed to the extent that it is not incompatible with the laws and practices of the Requested Party.

4. If the Central Authority of the Requested Party determines that execution of the request would interfere with ongoing proceedings or prejudice the safety of any person in the territory of the Requested Party, the Central Authority of that Party may postpone execution, or make execution subject to conditions determined necessary after consultation with the Requesting Party. If the Requesting Party accepts the assistance subject to the conditions, it shall comply with the conditions.

5. The Central Authority of the Requested Party shall facilitate the participation in the execution of the request of such persons as are specified in the request.

6. The Central Authority of the Requested Party may ask the Central Authority of the Requesting Party to provide information in such form as may be necessary to enable it to execute the request or to undertake any steps which may be necessary under the laws and practices of the Requested Party in order to give effect to the request received from the Requesting Party.

7. The Central Authority of the Requesting Party shall inform the Central Authority of the Requested Party promptly of any circumstances which make it inappropriate to proceed with the execution of the request or which require modification of the action requested.

10

- 8 -

8. "The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is denied, the Central Authority of the Requested Party shall inform the Central Authority of the reasons for the denial.

ARTICLE 6
Costs

1. The Requested Party shall, subject to paragraph (2) of this Article, pay all costs relating to the execution of the request, except for the fees of expert witnesses and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11 of this Treaty, which fees, allowances, and expenses shall be paid by the Requesting Party.

2. If the Central Authority of the Requested Party notifies the Central Authority of the Requesting Party that execution of the request might require costs or other resources of an extraordinary nature, or if it otherwise requests, the Central Authorities shall consult with a view to reaching agreement on the conditions under which the request shall be executed and the manner in which costs shall be allocated.

11

- 9 -

## ARTICLE 7

### Confidentiality and Limitations on Use

1.  The Requested Party shall, upon request, keep confidential any information which might indicate that a request has been made or responded to.  If the request cannot be executed without breaching confidentiality, the Requested Party shall so inform the Requesting Party, which shall then determine the extent to which it wishes the request to be executed.

2.  The Requesting Party shall not use or disclose any information or evidence obtained under this Treaty for any purposes other than for the proceedings stated in the request without the prior consent of the Requested Party.

3.  Unless otherwise indicated by the Requested Party when executing the request, information or evidence, the contents of which have been disclosed in a public judicial or administrative hearing related to the request, may thereafter be used for any purpose.

## ARTICLE 8

### Taking Testimony and Producing Evidence in the Territory of the Requested Party

1.  A person in the territory of the Requested Party from whom evidence is requested pursuant to this Treaty may be compelled, if necessary, to appear in order to testify or produce

12

- 10 -

documents, records, or articles of evidence by subpoena or such other method as may be permitted under the law of the Requested Party.

2.  A person requested to testify or to produce documentary information or articles in the territory of the Requested Party may be compelled to do so in accordance with the requirements of the law of the Requested Party.  If such a person asserts a claim of immunity, incapacity or privilege under the laws of the Requesting Party, the evidence shall nonetheless be taken and the claim be made known to the Requesting Party for resolution by the authorities of that Party.

3.  Upon request, the Central Authority of the Requested Party shall furnish information in advance about the date and place of the taking of the evidence pursuant to this Article.

4.  The Requested Party shall allow persons specified in the request to ask questions of the person whose testimony or evidence is being taken, through a legal representative qualified to appear before the courts of the Requested Party.

5.  Documentary information produced pursuant to this Article may be authenticated by the attestation of a person competent to do so in the form indicated in Appendix A to this Treaty.  No further authentication or certification shall be necessary in order for such documentary information to be admissible in evidence in proceedings in the territory of the Requesting Party.  Documentary information produced pursuant to

13

- 11 -

this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

### ARTICLE 9
### Records of Government Agencies

1.  The Requested Party shall provide the Requesting Party with copies of publicly available records of government departments and agencies of the Requested Party.

2.  The Requested Party may provide a copy of any record or information in the possession of a government department or agency but not publicly available to the same extent and on the same conditions as to its own law enforcement or judicial authorities.  The Requested Party may refuse a request pursuant to this paragraph entirely or in part.

3.  Official records provided pursuant to this Article shall be authenticated by the Central Authority of the Requested Party in the manner indicated in Appendix B to this Treaty.  No further authentication or certification shall be necessary in order for such records to be admissible in evidence in proceedings in the territory of the Requesting Party.  Records provided pursuant to this Article may also be authenticated pursuant to such other form or manner as may be prescribed from time to time by either Central Authority.

14

- 12 -

**ARTICLE 10**

**Personal Appearance in the Territory of the Requesting Party**

1.   A request under this Treaty may seek assistance in facilitating the appearance of any person in the territory of the Requesting Party for the purpose of giving evidence before a court or of being identified in, or otherwise by his presence assisting, any proceedings.

2.   The Central Authority of the Requested Party shall:

   (a)   ask a person whose voluntary appearance in the territory of the Requesting Party is desired whether he agrees to appear; and

   (b)   promptly inform the Central Authority of the Requesting Party of his answer.

3.   If the Central Authority of the Requesting Party so indicates, a person agreeing to appear in the territory of the Requesting Party pursuant to this article shall not be subject to service of process, or be detained or subjected to any restriction of personal liberty, by reason of any acts or convictions which preceded his departure from the territory of the Requested Party.

4.   The safe conduct provided for by this Article shall cease fifteen days after the Central Authority of the Requesting Party has notified the Central Authority of the Requested Party that the person's presence is no longer required, or if the

- 13 -

person has left the territory of the Requesting Party and
voluntarily returned to it.

## ARTICLE 11
### Transfer of Persons in Custody

1.  A person in the custody of one Party whose presence in
the territory of the other Party is sought for the purpose of
providing assistance under this Treaty shall be transferred for
that purpose if the person and both Parties consent.

2.  For the purposes of this Article:

    (a)  the Requesting Party shall be responsible for the
safety of the person transferred and shall have
the authority and the obligation to keep the
person transferred in custody unless otherwise
authorised by the Requested Party;

    (b)  the Requesting Party shall return the person
transferred to the custody of the Requested Party
as soon as circumstances permit and in any event
no later than the date upon which he would have
been released from custody in the territory of the
Requested Party, unless otherwise agreed by both
Central Authorities and the person transferred; and

16

– 14 –

(c)  the Requesting Party shall not require the
Requested Party to initiate extradition
proceedings for the return of the person
transferred.

**ARTICLE 12**

**Location or Identification of Persons**

1.  The Requested Party shall make best efforts to ascertain
the location or identity of persons specified in the request.

2.  The Central Authority of the Requested Party shall
promptly communicate the results of its inquiries to the Central
Authority of the Requesting Party.

**ARTICLE 13**

**Service of Documents**

1.  The Requested Party shall, as far as possible, effect
service of any document relating to or forming part of any
request for assistance properly made pursuant to this Treaty by
the Requesting Party, including any subpoena or other process
requiring the appearance of any person before any authority or
tribunal in the territory of the Requesting Party.

2.  Service of any subpoena or other process by virtue of
paragraph (1) of this Article shall not impose any obligation
under the law of the Requested Party to comply with it.

17

- 15 -

3.  The Central Authority of the Requesting Party shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting Party a reasonable time before the scheduled appearance.

4.  The Requested Party shall return a proof of service in the manner specified in the request.

### ARTICLE 14
### Search and Seizure

1.  The Requested Party shall execute a request for the search, seizure and delivery of any article to the Requesting Party if the request includes the information justifying such action under the laws of the Requested Party and it is carried out in accordance with the laws of that Party.

2.  The Requested Party may refuse a request if it relates to conduct in respect of which powers of search and seizure would not be exercisable in the territory of the Requested Party in similar circumstances.

3.  Every official who has custody of a seized article shall certify the continuity of custody, the identity of the article and the integrity of its condition in the form indicated in Appendix C to this Treaty.  No further authentication or certification shall be necessary in order to establish these matters in proceedings in the territory of the Requesting Party. Certification under this Article may also be provided in any

18

- 16 -

other form or manner as may be prescribed from time to time by either Central Authority.

4.   The Central Authority of the Requested Party may require that the Requesting Party agree to terms and conditions which the Requested Party may deem necessary to protect third party interests in the item to be transferred.

### ARTICLE 15
#### Return of Documents and Articles

The Central Authority of the Requesting Party shall return any documents or articles furnished to it in the execution of a request under this Treaty as soon as is practicable unless the Central Authority of the Requested Party waives the return of the documents or articles.

### ARTICLE 16
#### Assistance in Forfeiture Proceedings

1.   The Parties shall assist each other in proceedings involving the identification, tracing, freezing, seizure or forfeiture of the proceeds and instrumentalities of crime and in relation to proceedings involving the imposition of fines related to a criminal prosecution.

2.   If the Central Authority of one Party becomes aware that proceeds or instrumentalities are located in the territory of the

19

- 17 -

other Party and may be liable to freezing, seizure or forfeiture under the laws of that Party, it may so inform the Central Authority of the other Party. If the Party so notified has jurisdiction, this information may be presented to its authorities for a determination whether any action is appropriate. The said authorities shall issue their decision in accordance with the laws of their country and the Central Authority of that country shall ensure that the other Party is aware of the action taken.

3. A Requested Party in control of forfeited proceeds or instrumentalities shall dispose of them according to its laws. Either Party may transfer forfeited assets or the proceeds of their sale to the other Party to the extent permitted by their respective laws, upon such terms as may be agreed.

### ARTICLE 17
### Compatibility with Other Arrangements

Assistance and procedures set forth in this Treaty shall not prevent either of the Parties from granting assistance to the other Party through the provisions of other international agreements to which it may be a party, or through the provisions of its national laws. The Parties may also provide assistance pursuant to any arrangement, agreement, or practice which may be applicable between the law enforcement agencies of the Parties.

20

- 18 -

**ARTICLE 18**

**Consultation**

1.  The Parties, or Central Authorities, shall consult
promptly, at the request of either, concerning the implementation
of this Treaty either generally or in relation to a particular
case.  Such consultation may in particular take place if, in the
opinion of either Party or Central Authority, the expenses or
other resources required for the implementation of this Treaty
are of an extraordinary nature, or if either Party has rights or
obligations under another bilateral or multilateral agreement
relating to the subject matter of this Treaty.

2.  With respect to any matter for which assistance could be
granted under this Treaty, neither Party shall enforce any
compulsory measure requiring an action to be performed by any
person located in the territory of the other Party, unless the
Party proposing such enforcement has first exhausted the
procedures established in paragraphs (3) and (4) of this Article.

3.  If a Party is aware that its authorities are intending
to take measures referred to in paragraph (2) of this Article,
its Central Authority shall inform the other Central Authority,
who may request consultations.  If the other Party is aware of or
considers that the authorities of the first Party have taken or
are about to take any such measures, its Central Authority may
request consultations.  Thereafter, the Central Authorities shall

21

- 19 -

consult with a view to determining whether the assistance sought can be provided under this Treaty, or otherwise resolving the matter.

4.  Where consultations fail to resolve the matter, or unreasonable delay may be jeopardizing the successful completion of a proceeding, either Central Authority may give the other written notice to that effect.

5.  Unless otherwise agreed by the Parties, the obligations under paragraphs (2), (3) and (4) of this Article shall have been fulfilled 21 days after receipt of this written notice, provided that this is not less than 60 days after receipt of the request referred to in paragraph (3) above.

6.  Even in those cases in which the Parties' obligations under this Article have been fulfilled, each Party shall continue to exercise moderation and restraint.

### ARTICLE 19
### Definitions

1.  For the purposes of this Treaty, "proceedings" means proceedings related to criminal matters and includes any measure or step taken in connection with the investigation or prosecution of criminal offences, including the freezing, seizure or forfeiture of the proceeds and instrumentalities of crime, and the imposition of fines related to a criminal prosecution.

22

- 20 -

2.  In addition, the Central Authorities may at their discretion treat as proceedings for the purpose of this Treaty such hearings before or investigations by any court, administrative agency or administrative tribunal with respect to the imposition of civil or administrative sanctions as may be agreed in writing between the Parties.

### ARTICLE 20
### Territorial Application

This Treaty shall apply:

1.  in relation to the United Kingdom:

    (a)  to England and Wales, Scotland, and Northern Ireland; and

    (b)  to the Isle of Man, Channel Islands and to any other territory for whose international relations the United Kingdom is responsible and to which this Treaty shall have been extended by agreement between the Parties, subject to any technical modifications agreed by the Parties and to either Party being able to terminate such extension by giving six months written notice to the other through the diplomatic channel; and

2.  to the United States of America.

23

- 21 -

### ARTICLE 21

#### Ratification and Entry into Force

1.  This Treaty shall be ratified, and the instruments of ratification shall be exchanged at London as soon as possible.

2. This Treaty shall enter into force upon the exchange of instruments of ratification.

### ARTICLE 22

#### Termination

Either Party may terminate this Treaty by means of a written notice to the other Party.  Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE in duplicate at Washington this sixth day of January, 1994.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
UNITED KINGDOM OF GREAT BRITAIN
AND NORTHERN IRELAND:

24

## Appendix A

### CERTIFICATE OF AUTHENTICITY OF BUSINESS RECORDS

I, _____, attest on penalty of criminal
      (Name)

punishment for false statement or false attestation that I am

employed by _____
            (Name of Business from which documents are produced)

and that my official title is _____. I further
                              (Official Title)

state that each of the records attached hereto is the original

or a duplicate of the original of records in the custody

of _____. I
   (Name of Business from which documents are produced)

further state that:

    A)    such records were made at or near the time of the

           occurrence of the matters set forth, by (or from

           information transmitted by) a person with knowledge

           of those matters;

    B)    such records were kept in the course of a regularly

           conducted business activity;

    C)    the business activity made the records as a regular

           practice; and

    D)    if any of such records is not the original, such

           record is a duplicate of the original.


_____          _____
      (Signature)                      (Date)


Sworn to or affirmed before me, _____,
                                         (Name)

a _____, this ____ day
  (notary public, judicial officer, etc.)

of _____, 199____.

25

**Appendix B**

**ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS**

I, _____, attest on penalty of criminal
          (Name)

punishment for false statement or attestation that my position

with the Government of _____
                                          (Country)

is _____ and that in that position I am
        (Official Title)

authorized by the law of _____
                                          (Country)

to attest that the documents attached and described below are

true and accurate copies of original official records which are

recorded or filed in _____
                              (Name of Office or Agency)

which is a government office or agency of the Government of

_____.
        (Country)

    Description of Documents:

                              _____
                                        (Signature)

                              _____
                                        (Title)

                              _____
                                        (Date)

26

**Appendix C**

**ATTESTATION WITH RESPECT TO SEIZED ARTICLES**

I, _____, attest on penalty of criminal
       (Name)

punishment for false statement or attestation that my position

with the Government of _____
                              (Country)

is _____.  I received custody of the articles
    (Title)

listed below from _____ on _____, at
              (Name of Person)      (Date)

_____.  I relinquished custody of the
     (Place)

articles listed below to _____
                   (Name of Person)

on _____ at _____
   (Date)         (Place)

in the same condition as when I received them (or if different,

as noted below).

    Description of Articles:


    Changes in condition while in my custody:


Official Seal       _____
                       (Signature)

                      _____
                       (Title)

                      _____
                       (Place)

                      _____
                       (Date)

27

DEPARTMENT OF STATE
WASHINGTON
January 6, 1994

Excellency:

I have the honor to acknowledge receipt of Your Excellency's Note of today's date, which reads as follows:

"I have the honour to refer to the Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (the Treaty) signed today.  I have the honour to propose that the Treaty be applied in accordance with the provisions set out in this Note.

(a)  The term 'important public policy' in Article 3(1)(a) would include a Requested Party's policy of opposing the exercise of jurisdiction which in its view is extraterritorial and objectionable.

(b)  Article 3(1)(b) shall not affect the availability of assistance in respect of other participants in the offense for which assistance is requested who would not be entitled to be discharged on the grounds of previous acquittal or conviction.

His Excellency
    Sir Robin W. Renwick, K.C.M.G.,
        Ambassador of the United Kingdom
            of Great Britain and Northern Ireland.

28

- 2 -

(c)  Article 7(2) shall not preclude the use
or disclosure of information to the extent that
there is an obligation to do so under the
Constitution or law of the Requesting Party in a
criminal prosecution.  Any such proposed
disclosure shall be notified by the Requesting
Party to the Requested Party in advance.

(d)  The Treaty shall not apply to
anti-trust or competition law investigations or
proceedings at this time.  The Central
Authorities may at their discretion treat as
proceedings for the purpose of this Treaty such
anti-trust or competition law matters, or
anti-trust or competition law matters generally,
as may be agreed in writing between the Parties
at a later date.

(e)  'Compulsory measures'  in Article 18,
including in the case of the United States a
grand jury subpoena, are those measures that
require an action to be performed by any person
located in the territory of the Party not issuing
the measure and that fall within the following
categories:

(i)  any measure for the production of
evidence located in the territory of the
Party not issuing the measure;

(ii)  any measure relating to assets in
the territory of the Party not issuing the
measure; or

(iii)  any measure compelling a natural
person who is in the territory of one Party
to make a personal appearance in the
territory of the other Party unless:

29

- 3 -

a) the Party compelling the appearance has lawfully obtained jurisdiction over that person; or

b) the person is a national of the Party compelling the appearance,

without prejudice to whether a Party objects to these compulsory measures or the jurisdiction claimed by the other Party. The Central Authorities may add to or amend the categories referred to above as may be agreed in writing between the Parties.

(f)  In the spirit of cooperation, mutual respect, and good will, and in the interests of facilitating the cooperative use of the Treaty with respect to proceedings that fall within its scope and of avoiding measures which could result in a conflict of laws, policies, or national interests, the United States Government shall take several practical measures to reduce the number of instances in which conflict may be anticipated.  In particular, the United States Department of Justice, on behalf of the United States Government, shall:

(i)  instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the United States Central Authority has concluded that the provisions of Article 18 of the Treaty have been satisfied;

30

- 4 -

(ii)  instruct all federal prosecutors
not to enforce any compulsory measures, as
referred to in Article 18(2), with respect
to any matter for which assistance could be
granted under the Treaty, unless the United
States Central Authority has concluded that
the provisions of Article 18 have been
satisfied; and

(iii)  undertake to discourage the
issue of compulsory measures by other United
States Government agencies for evidence
located in the United Kingdom in any matter
covered by the Treaty by advising all such
agencies not to seek such process without
consultation and coordination with the
United States Central Authority.

If the above proposal is acceptable to the
Government of the United States of America, I have the
honour to propose that this Note and Your Excellency's
reply to that effect shall constitute an agreement
between our two Governments, which shall enter into
force on the date of entry into force of the Treaty.

I have the honour to convey to Your Excellency
the assurance of my highest consideration."

I have the further honor to inform Your Excellency
that the foregoing proposals are acceptable to the
Government of the United States of America and that Your
Excellency's Note and this Note shall constitute an
agreement between our two Governments, which shall enter
into force on the date of entry into force of the Treaty.

For The Secretary of State:

31

British Embassy
Washington D.C.

His Excellency
Warren M Christopher
Secretary of State
of the United States of America          6 January 1994

Your Excellency,

I have the honour to refer to the Treaty between the
Government of The United States of America and the Government of
the United Kingdom of Great Britain and Northern Ireland on
Mutual Legal Assistance in Criminal Matters (the Treaty) signed
today.  I have the honour to propose that the Treaty be applied
in accordance with the provisions set out in this Note.

(a) The term "important public policy" in Article 3(1)(a)
would include a Requested Party's policy of opposing the
exercise of jurisdiction which in its view is
extraterritorial and objectionable.

(b) Article 3(1)(b) shall not affect the availability of
assistance in respect of other participants in the offence
for which assistance is requested who would not be entitled
to be discharged on the grounds of previous acquittal or
conviction.

(c) Article 7(2) shall not preclude the use or disclosure of
information to the extent that there is an obligation to do
so under the Constitution or law of the Requesting Party in
a criminal prosecution.  Any such proposed disclosure shall
be notified by the Requesting Party to the Requested Party
in advance.

(d) The Treaty shall not apply to anti-trust or competition
law investigations or proceedings at this time.  The Central
Authorities may at their discretion treat as proceedings for
the purpose of this Treaty such anti-trust or competition
law matters, or anti-trust or competition law matters
generally, as may be agreed in writing between the Parties
at a later date.

(e) "Compulsory measures" in Article 18, including in the
case of the United States a grand jury subpoena, are those
measures that require an action to be performed by any
person located in the territory of the Party not issuing the
measure and that fall within the following categories:

32

(i) any measure for the production of evidence located in the territory of the Party not issuing the measure;

(ii) any measure relating to assets in the territory of the Party not issuing the measure; or

(iii) any measure compelling a natural person who is in the territory of one Party to make a personal appearance in the territory of the other Party unless:

a) the Party compelling the appearance has lawfully obtained jurisdiction over that person; or

b) the person is a national of the Party compelling the appearance,

without prejudice to whether a Party objects to these compulsory measures or the jurisdiction claimed by the other Party.

The Central Authorities may add to or amend the categories referred to above as may be agreed in writing between the Parties.

(f) In the spirit of cooperation, mutual respect, and good will, and in the interests of facilitating the cooperative use of the Treaty with respect to proceedings that fall within its scope and of avoiding measures which could result in a conflict of laws, policies, or national interests, the United States Government shall take several practical measures to reduce the number of instances in which conflict may be anticipated. In particular, the United States Department of Justice, on behalf of the United States Government, shall:

(i) instruct all federal prosecutors not to seek compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty unless the United States Central Authority has concluded that the provisions of Article 18 of the Treaty have been satisfied;

(ii) instruct all federal prosecutors not to enforce any compulsory measures, as referred to in Article 18(2), with respect to any matter for which assistance could be granted under the Treaty, unless the United States Central Authority has concluded that the provisions of Article 18 have been satisfied; and

(iii) undertake to discourage the issue of compulsory measures by other United States Government agencies for evidence located in the United Kingdom in any matter covered by the Treaty by advising all such agencies not to seek such process without consultation and coordination with the United States Central Authority.

33

If the above proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Note and Your Excellency's reply to that effect shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Treaty.

I have the honour to convey to Your Excellency the assurance of my highest consideration.

ROBIN W RENWICK